# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 47991

IDAHO SUPERINTENDENT OF PUBLIC
INSTRUCTION SHERRI YBARRA, in her
official capacity,

    Petitioner,

v.

THE LEGISLATURE OF THE STATE OF
IDAHO, by REPRESENTATIVE SCOTT
BEDKE, in his official and representative capacity
as SPEAKER OF THE HOUSE OF
REPRESENTATIVES and SENATOR BRENT
HILL, in his official and representative capacity
as SENATE PRESIDENT PRO TEM; and THE
IDAHO STATE BOARD OF EDUCATION by
DEBBIE CRITCHFIELD, in her official and
representative capacity as PRESIDENT OF THE
BOARD,

    Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, June 2020 Term

Opinion filed: June 22, 2020

Melanie Gagnepain, Clerk

---

Original proceeding in the Idaho Supreme Court seeking a declaratory judgment, writ of mandamus, and writ of prohibition.

The Petitioner's Verified Petition for declaratory judgment is <u>dismissed.</u> The Petitioner's alternate request for a peremptory writ of mandamus or prohibition is <u>denied.</u>

Leroy Law Offices, Special Deputy Idaho Attorney General, Boise, for Petitioner Sherri Ybarra. David Leroy argued.

Holland and Hart, Boise, for Respondents the Legislature of the State of Idaho, Scott Bedke, and Brent Hill. Mary York argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Respondents, Idaho State Board of Education and Debbie Critchfield. Cynthia Lin Yee-Wallace argued.

_____

MOELLER, Justice

1

This case asks us to clarify the role of the Idaho Superintendent of Public Instruction within the constitutional framework of public education in Idaho. Petitioner Sherri Ybarra, the Idaho Superintendent of Public Instruction, has petitioned this Court for a declaratory judgment, writ of mandamus, or writ of prohibition to remedy various alleged constitutional violations by the Idaho Legislature and the Idaho State Board of Education related to the funding and supervision of eighteen employees currently working in the Idaho Department of Education. To effectuate such relief, the Superintendent invokes the original jurisdiction of the Idaho Supreme Court pursuant to Article V, Section 9 of the Idaho Constitution. For the following reasons, we dismiss the Superintendent's petition for declaratory relief and deny her request for both extraordinary writs.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Idaho's public education system is administered and supervised by two separate executive branch agencies: the Idaho State Board of Education ("the Board") and the Idaho State Department of Education ("the Department"). The Board is comprised of eight members, seven appointed by the Governor and one elected by the people—the Superintendent of Public Instruction—who serves as an equal, voting member of the Board in an ex officio capacity. Debbie Critchfield serves as President of the Board, which sets policy for public education in Idaho. The Department is led by the Superintendent of Public Instruction, Sherri Ybarra ("the Superintendent"), and is responsible for implementing the Board's policies, distributing funds for a variety of programs, administering assessments, licensing teachers for public K-12 education in Idaho, and a multitude of other educational duties.

During the 2020 legislative session, the Idaho Legislature passed two appropriation bills—Senate Bills 1409 and 1410 (collectively, "the Appropriation Bills")—which transferred supervision of eighteen full-time job positions within the Department's Technology Group to the Board along with approximately $2.7 million in funding for those positions. More specifically, SB 1409 appropriated the positions and funding for the Technology Group to the Board while SB 1410 removed the Technology Group positions and budgets from the Department. The Governor signed the Appropriation Bills into law and they will become effective July 1, 2020.

The Technology Group consists of twenty-one employees, and it manages the statewide Idaho System for Education Excellence ("ISEE"). As the Superintendent explained in her petition, this system "tracks each pupil in Idaho for all years and all schools as to attendance,

demographics, grades, test scores and other pertinent information to support budgeting processes, data submissions, monetary distribution, accountability and delivery of information to policy makers and educational stakeholders to create data driven decisions." This data collection also provides the necessary information for compliance with certain state and federal reporting and funding system requirements. The ISEE was originally created through grant funding obtained by the Board, and then developed within the Department. Prior to the passage of the Appropriation Bills, the Superintendent maintained direct supervision and management of the Technology Group. If the Appropriation Bills go into effect on July 1, 2020, only three full-time employees of the Technology Group, and the funding for those positions, will remain under the Superintendent's supervision and within the Department's budget.

The Superintendent argues that "by splitting eighteen employees away from three other workers and eliminating all funding for the office space, rent, and the maintenance and upgrading of the Department's computers, this line item appropriation decentralizes and damages operations." She also claims these bills are the Legislature's attempt to "strip the Superintendent of her authority through the budget process," in retaliation for her failure to support a 2019 revised school funding formula. In addition, she reminds the Court that the COVID-19 pandemic has created an even greater need for the Technology Group's services and systems, especially in support of remote education efforts and data collection for the Department and Superintendent. In response, the Legislature states that the purpose of the Appropriation Bills was "to improve the functions of the technology programs for public schools and to centralize the operations and supervision of the programs within the Office of the Board of Education." According to the Legislature, only the funding and supervision for the eighteen employees will change when the Appropriation Bills go into effect. Moreover, the Legislature has explained that the Superintendent and Department "will continue to have full access to the data and information," and the Technology Group's location, computers, and work would remain the same.

Prior to the Governor's signing of the Appropriation Bills into law, the Superintendent proposed a "Memorandum of Understanding" to the Board, which provided that the Board would pay for the Technology Group with its newly budgeted funds, but the Superintendent would retain supervision and control over all twenty-one of its employees within the Department. The Board held two votes on the matter, each time rejecting the Superintendent's proposal. The Superintendent then made requests to the Governor for a line-item veto and "to intercede with

3

the Board . . . to resolve the impasse." Nevertheless, the Governor signed both bills. After she was unsuccessful in her entreaties to the Board and Governor, the Superintendent filed a petition with this Court seeking: (1) a declaratory judgment that the Appropriation Bills prevent her from discharging her constitutional duties as Superintendent of Public Instruction and unconstitutionally delegate the "inherent duties and implied powers" of her office to the Board; (2) a writ of mandamus compelling the Board to "cease and desist" in interfering with her authority over the entire Technology Group while funding the Technology Group pursuant to SB 1409; and/or (3) a writ of prohibition barring the Board from interfering with the Superintendent's authority over the Technology Group and prohibiting the Board from withholding payments for the Technology Group as appropriated by SB 1409.

## II.     JURISDICTION AND STANDARD OF REVIEW

Article V, Section 9 of the Idaho Constitution vests this Court with original jurisdiction to issue writs of mandamus and prohibition, as well as "all writs necessary or proper to the complete exercise of its appellate jurisdiction." This original jurisdiction is limited only by the separation of powers provisions contained in Article II, Section 1 of the Idaho Constitution and this Court's own rules. *Mead v. Arnell*, 117 Idaho 660, 663, 791 P.2d 410, 413 (1990). "Any person may apply to the Supreme Court for the issuance of any extraordinary writ or other proceeding over which the Supreme Court has original jurisdiction." I.A.R. 5(a). The procedural guidelines over special writs are outlined in Idaho Appellate Rule 5. Once this Court asserts its original jurisdiction, "it may issue writs of mandamus and/or prohibition." *Mead*, 117 Idaho at 663–64, 791 P.2d at 413–14.

Although neither the Board nor the Legislature has argued that this Court lacks jurisdiction to issue a declaratory judgment on the constitutionality of the Appropriation Bills, we note that recent precedent supports such a course. In *Regan v. Denney*, we agreed to take up a constitutional challenge to a citizen's initiative on direct appeal due, in part, to the urgency of the issue. 165 Idaho 15, 20, 437 P.3d 15, 20 (2019) (recognizing that "this Court may 'exercise jurisdiction to review a petition for extraordinary relief where the petition alleges sufficient facts concerning a possible constitutional violation of an urgent nature.' " (quoting *Coeur D'Alene Tribe v. Denney*, 161 Idaho 508, 513–14, 387 P.3d 761, 766–67 (2015))). Our willingness to act upon our original jurisdiction includes cases requiring a determination of the constitutionality of recent legislation where there is "urgency of the alleged constitutional violation and the urgent

need for an immediate determination." *Id.* at 21, 437 P.3d at 21. The allowance or refusal of the writ is a discretionary exercise rather than a writ of right—"it is not a prerogative that we exercise lightly, but one we reserve the right to exercise on a case by case basis when compelled by urgent necessity." *Id.* at 20, 437 P.3d at 20. Because we find that this case presents an urgent constitutional dispute between two executive branch agencies and the Legislature concerning the education of Idaho's children, and the potential for uncertainty and disruption of educational services during a drawn out trial court proceeding is great, it is altogether fitting and appropriate that we should assert our original jurisdiction in this matter.

Inasmuch as this matter comes to us through the exercise of our original jurisdiction, there are no proceedings below to review. Accordingly, we will conduct a true de novo analysis of the constitutional provisions and statutes in question. *Id.* at 19, 437 P.3d at 19. In so doing, we are mindful that there is a presumption in favor of constitutionality, and the challenger bears the burden of establishing that a statute is unconstitutional. *Leavitt v. Craven*, 154 Idaho 661, 665, 302 P.3d 1, 5 (2012) (citing *Stuart v. State*, 149 Idaho 35, 40, 232 P.3d 813, 818 (2008)). We further recognize that "[t]he judicial power to declare legislative action unconstitutional should be exercised only in clear cases." *Id.* (quoting *Stuart*, 149 Idaho at 40, 232 P.3d at 818).

### III.    ANALYSIS

The Superintendent petitions the Court for a declaratory judgment that the Appropriation Bills are unconstitutional. She also seeks a writ of mandamus and/or a writ of prohibition that would allow SB 1409's funding appropriation to the Board to remain intact, but would restore the Superintendent's full management authority over the Technology Group. In support of her position, she contends that the Superintendent has inherent duties and powers arising from both the Idaho Constitution and the Territorial Laws of Idaho. The Legislature and Board argue that the Appropriation Bills are a constitutional state expenditure. In addition, the Legislature filed a motion to strike certain hearsay and legal conclusions from the declarations and exhibits submitted by the Superintendent.

It is important to recognize that this dispute has its roots in Idaho's mid-19th century territorial period and its later transition to statehood. It was a battle waged at the Idaho Constitutional Convention of 1889 and periodic skirmishes ensued during the constitutional reforms of the 20th century. The balance of power between the Department, the Board, and the Legislature appears to have ebbed and flowed over time, often as a result of the personalities,

5

abilities, and political views of the people serving in those organizations. Now, in the 21st century, we have been asked to revisit this same dispute and somehow define the core duties of a constitutional office that have never been clearly defined for over 150 years.

As we commence our analysis, the dire warnings of danger to our Constitution and the public school system raised by the parties bring to mind the enduring words of Justice Charles F. McDevitt when this Court was asked to make a similarly weighty decision in 1990:

> On each side of this issue are arrayed knowledgeable and intelligent individuals who argue that a decision following one course would result in [] usurpation and [] disruption. . . . All presenting arguments on this issue are agreed that however this Court might rule, if contrary to their expressed positions, the Court will be doing violence to the Constitution of the state of Idaho. Into this thicket this Court has been invited.

*Mead*, 117 Idaho at 661, 791 P.2d at 411. Inasmuch as we, too, have now been invited into this same constitutional "thicket," we recognize that not only have grave constitutional concerns been laid before us, but also allegations of legislative intrigue and retaliation. Nevertheless, we confine our analysis to the constitutional questions.

### A. The motion to strike is granted in part and denied in part.

Before delving into the constitutional analysis, we must first address the Legislature's motion to strike declarations submitted by the Superintendent and her deputy, Marilyn Whitney, along with the expert report of Russell Joki, Ed.D. The Legislature argues that portions of these documents contain impermissible hearsay and legal opinions. After considering the parties' positions at oral argument, we grant the motion in part.

The Idaho Rules of Evidence define hearsay as an out-of-court statement that "a party offers in evidence to prove the truth of the matter asserted in the statement." I.R.E. 801(c). As to the two declarations, the Superintendent concedes that they contain out-of-court statements which would normally be deemed hearsay; however, she argues that the declarations are not offered for the truth of the matter asserted. Therefore, the Superintendent avers that the statements suggesting "improper motives" on the part of certain legislators are admissible because it does not matter whether the statements are true—they are only offered to show *her state of mind* rather than the *legislative intent* behind the Appropriation Bills. More specifically, she asserts that these statements are (1) not hearsay because they are not offered for the truth but to show their effect upon the listener and (2) they are relevant irrespective of their truth because they explain her response to the Appropriation Bills, including the filing of this action.

6

There has been no showing by the Superintendent as to how her state of mind concerning the statements allegedly made by legislators—let alone how they affected her response—are in any way material to the constitutional questions before this Court. All evidence proffered in a court proceeding must meet the threshold standard for relevance to be admitted: does it make a "fact of consequence" "more or less probable than it would be without the evidence?" I.R.E. 401. In other words, relevant evidence must be both material and probative. Here, we find that while evidence of an alleged improper motive by certain legislators may be probative of the Superintendent's state of mind and how it influenced her response, such facts are simply not material because neither her state of mind nor her response are facts of consequence. Merely saying that these statements are "not offered for proof of the truth" is insufficient; there must also be a requisite showing that the statements speak to a material fact of the case. Therefore, even assuming, *arguendo*, that these statements are not hearsay, we conclude that they are not relevant and, accordingly, should be stricken.

Regarding Dr. Joki's expert report, it consists largely of a selective history of Idaho's public education system from its early territorial days to the present. While it contains a helpful compilation of historic facts, it also includes multiple statements consisting entirely of Dr. Joki's personal legal conclusions. The Superintendent concedes that there are legal conclusions in the report, but argues they should be considered "to the extent they are relevant and helpful to the Court."

We have previously held that testimony containing conclusions of law by an expert witness is generally inadmissible. For example, in *Ballard v. Kerr*, we concluded that when an expert witness offers a legal conclusion it "invade[s] the province of the court to determine the applicable law." 160 Idaho 674, 694, 378 P.3d 464, 484 (2016) (quoting *Torres v. Cnty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985)) (alteration in original). Additionally, Idaho Rule of Evidence 702 only permits expert testimony "if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." We respectfully conclude that while the factual materials stated in the report are helpful, the legal analysis of a non-lawyer, expert witness is not. Accordingly, we strike the legal conclusions contained in the following paragraphs from Dr. Joki's declaration: Paragraphs 20, 21, 22, 24, 25, 29, 30, 33, 34, 35, 36, 37, 38, 39, 41, 42, 43, 44, 46, 47, 48, 50, and the "Conclusion."

7

**B. The Appropriation Bills are constitutional.**

The Superintendent asks this Court for a declaratory judgment that she "has the right, duty and authority pursuant to the inherent and implied powers of Article IV, Section 1 of the Idaho Constitution to utilize the Technology Group to fully discharge her constitutional duties in leading, directing and supervising the public and secondary schools of Idaho and the Department." She also asks that we declare that the Appropriation Bills unconstitutionally delegate her inherent duties and implied powers to the Board. The Superintendent contends that although these duties are not specifically set forth anywhere in the Idaho Constitution, they survive as part of the "core duties" of her office as defined by Idaho's territorial statutes. The Legislature and Board contend that when the Idaho Constitution was adopted, it expressly vested the Board, not the Superintendent, with general supervision of the public schools, regardless of how the Superintendent's office functioned prior to statehood. Thus, the key inquiries on appeal are whether (1) the Idaho Constitution vests inherent duties and powers—not set forth within the text of the Constitution—to the Superintendent and (2) the Appropriation Bills impermissibly restrict or delegate those duties and powers. While we agree that the Superintendent retains certain duties of her office as a constitutional officer, we conclude that the Appropriation Bills have not impermissibly restricted or delegated those powers due to the structural changes in public education administration brought about by the adoption of the Idaho Constitution and the amendments of 1912.

The structure of Idaho's original public education system somewhat resembles what we have today. In 1866, the initial territorial laws of Idaho created the office of Territorial Superintendent of Public Instruction and imbued it with the authority "[t]o exercise a general supervision over such schools as may be established by law." LAWS OF THE TERRITORY OF IDAHO, Ch. VI, Title II, Art. ll, § l (1866). However, those duties were to be accomplished "with the advice and *subject to the supervision of the Territorial Board of Education*." *Id.* (emphasis added). In 1887, just two years prior to the adoption of the Idaho Constitution, Idaho's territorial laws were amended to broadly endow the office of the superintendent with the duty "to superintend the public schools in the Territory." REVISED STATUTES OF IDAHO TERRITORY, Title III, Chapter II, §§ 630–31 (1887). These changes provided that the Territorial Superintendent

8

served "by and with the advice and *consent of the Legislative Council*," rather than under the Territorial Board of Education, which was no longer in existence. *Id*. (Emphasis added).[1]

During the Idaho constitutional convention, the delegates specifically debated whether the "general supervision of the public schools" should continue to lie with the Superintendent alone or with an advisory board. PROCEEDINGS AND DEBATES OF THE CONSTITUTIONAL CONVENTION 638–39, 644–47 (1889). Recognizing both the "common custom" of other western states to vest such authority in a state board, as well as the adage that "three heads are better than one," the delegates voted to vest authority over education and public schools in the Idaho Board of Education. PROCEEDINGS AND DEBATES OF THE CONSTITUTIONAL CONVENTION, 638, 644–47, 827. In some ways, the plan adopted at the Constitutional Convention more closely resembled the 1866 territorial laws than the ones in effect just prior to statehood due to the primacy of the State Board of Education. However, the delegates to the Convention made the Superintendent the president and a voting member of the Board. Since then, the Superintendent has always retained a constitutionally mandated membership on the Board by virtue of her office (*i.e.,* ex officio). IDAHO CONST. art. IX, § 2; PROCEEDINGS AND DEBATES OF THE CONSTITUTIONAL CONVENTION, 827.

As noted, Article IX, Section 2 of the Idaho Constitution was amended in 1912. It now sets forth three primary provisions that concern the Superintendent's powers and role. The first section vests authority over state educational institutions in the Board, while making the Superintendent a voting member of the Board:

> The *general supervision* of the state educational institutions and public school system of the state of Idaho, *shall be vested in a state board of education*, the membership, powers and duties of which shall be prescribed by law. The state superintendent of public instruction shall be ex officio member of said board.

IDAHO CONST. art. IX, § 2 (emphasis added). This provision has remained in effect since it was amended in 1912. Prior to that amendment, Article IX, Section 2 vested general supervision in a three-member Board of Education, comprised of the secretary of state, attorney general, and superintendent, with the superintendent designated as president of the Board. House Joint Resolution No. 30, § 2, Idaho Session Laws 791, 792 (1911), ratified Nov. 5,

---

[1] It is worth noting that the Superintendent focuses primarily on the Territorial Superintendent's residual duties for just a few years—from 1887 to 1889—while ignoring that for most of Idaho's territorial period—from 1866 to 1886—the Territorial Superintendent served "subject to the supervision of the Territorial Board of Education." LAWS OF THE TERRITORY OF IDAHO, Ch. VI, Title II, Art. ll, § l.

1912; PROCEEDINGS AND DEBATES OF THE CONSTITUTIONAL CONVENTION, 827. As Dr. Joki noted in his Report, the 1912 amendment was the result of a conscious desire by the Legislature to better fulfill the constitutional mandate: "to establish and maintain a general, uniform and thorough system of public, free common schools." IDAHO CONST. art. IX, § 2. Although Dr. Joki describes this as a "buffer plan" and suggests that it reflected the " 'uneasy balance' of the competing political entities [] still in play," it cannot be reasonably understood that the passage of this amendment to the Idaho Constitution by two-thirds of both houses of the Legislature— and later by the majority of the people of Idaho—was somehow intended as merely an interim solution. Indeed, while the "competing political entities" may still be debating the wisdom of this change, the amendment has remained in effect for well over a century.

The second constitutional provision mentioning the Superintendent is contained in the section establishing the elected offices of the executive department, which designates the Superintendent as a constitutional officer without enumerating any specific duties. IDAHO CONST. art. IV, § 1. Instead, consistent with the constitutional directive, most of the Superintendent's duties and powers have been laid out in the Idaho Code by the Legislature. Idaho Code section 33-125 sets forth the Superintendent's quintessential duties as serving

> as the executive officer of [the Department] and . . . carrying out policies, procedures and duties authorized by law or *established by the state board of education* for all elementary and secondary school matters, and to administer grants for the promotion of science education as provided in sections 33-128 and 33-129, Idaho Code.

(Emphasis added). The Legislature has also prescribed additional duties related to the Department's role in administering and managing the public school system. *See, e.g.,* I.C. § 33-120 (prescribing forms and format for uniform accounting); I.C. § 33-125A (directing the Department on coordinating telecourses, teleconferences, and other training services to public schools and higher education institutions); I.C. § 33-127 (appointing employees of the Department); I.C. § 33-132 (supervising internet policies and their compliance for state funding); I.C. § 67-1502 (filing of reports transmitted by county superintendents); I.C. § 67-1504 (enforcing the rules and regulations of both elementary and secondary school matters under the control of the Board); I.C. § 67-1506 (annually reporting on the condition of public schools, the amount of the state school fund apportioned and sources from which derived, with corresponding suggestions and recommendations).

Finally, the third provision of the Idaho Constitution touching on the Superintendent's duties is found in Article IX, Section 7, where the Superintendent is designated as a member of the State Board of Land Commissioners. Consisting of the "the governor, superintendent of public instruction, secretary of state, attorney general and state controller," the State Land Board is charged with the duty to provide for "the direction, control and disposition of the public lands of the state, …" IDAHO CONST. art. IX, § 7. This important board oversees "the location, protection, sale or rental of all [state] lands … in such manner as will secure the maximum long term financial return to the institution to which granted or to the state if not specifically granted; …" IDAHO CONST. art. IX, § 8.

While acknowledging her constitutional and legislatively prescribed duties, the Superintendent asks us to look back to Idaho's territorial laws as a source of authority for additional duties "inherent to her office." This Court's holdings in *Williams v. State Leg. of State of Idaho*, 111 Idaho 156, 722 P.2d 465 (1986), and *Wright v. Callahan*, 61 Idaho 167, 99 P.2d 961 (1940), established that certain nonspecified powers of a state constitutional office may be retained from its territorial counterpart. In *Williams*, the State Auditor filed for a declaratory judgment action in the district court, arguing that the Legislature's failure to appropriate funds for his post-audit function deprived him of a constitutional power and duty. 111 Idaho at 157, 722 P.2d at 466. The district court ruled in the State Auditor's favor and issued a permanent injunction that effectively placed authority for post-audit functions in the State Auditor. *Id.* On appeal, this Court analyzed whether the post-audit function was a constitutional duty of the State Auditor. *Id.* The court explained that Article IV, Section 1 of the Idaho Constitution created the elected office of the State Auditor, but did not set forth any express powers for that office. *Id.* The Court concluded that because the territorial counterpart would have been authorized to perform a modern post-audit function, and the constitution lacked any mention of a post-audit, the State Auditor retained this implied constitutional power. *Id.* at 160, 722 P.2d at 469.

This holding corresponds with the similar analysis laid out in *Wright v. Callahan*, where the Court concluded "[t]he Legislature cannot take from a constitutional officer a portion of the *characteristic* duties belonging to the office, and devolve them upon an officer of its own creation." 61 Idaho at 179, 99 P.2d at 966 (quoting Cooley's Constitutional Limitations, 61 n.2 (8th ed.) (emphasis in original). In *Wright*, the Court held that "[t]he statute under consideration, in the main, clearly takes from the State Auditor activities which, prior to the time of the

11

adoption of the Constitution, were vested in the territorial controller, and since the adoption of the Constitution, have been in the office of State Auditor as a constitutional officer." *Id.* However, the Idaho Constitution also mandates: "All laws now in force in the territory of Idaho which are not repugnant to this Constitution shall remain in force until they expire by their own limitation or be altered or repealed by the legislature." art. XXI, § 2. Thus, the Idaho Constitution is the primary source of authority and can limit the powers once held by a constitutional officer's territorial counterpart. *See also Williams*, 111 Idaho at 161, 722 P.2d at 470.

Also similar to the circumstances here, a prior Superintendent of Public Instruction sought a special writ under this Court's original jurisdiction in the case of *Evans v. Andrus*, 124 Idaho 6, 855 P.2d 467 (1993). In *Evans*, the Superintendent asked the Court for a declaratory judgment that a House bill unconstitutionally attempted to divide the Board into three autonomous governing bodies with discrete responsibilities, as well as a writ to bar the Governor and Board from complying with the Legislation. 124 Idaho at 9, 855 P.2d at 471. In analyzing Article IX, Section 2 of the Idaho Constitution, this Court concluded that its plain language clearly vested only the Board with governance over all state educational systems and public schools. *Id.* at 10, 855 P.2d at 471. Because the House bill would have effectively created three separate boards of education—dividing the supervision over educational institutions—the legislation would have deprived "the single constitutionally mandated board of authority to act as a whole body on all educational issues." *Id.* at 11, 855 P.2d at 472. Thus, the Court declared the House bill unconstitutional for abridging Article IX, Section 2, and issued the requested writ of prohibition. *Id.*

Undoubtedly, as in *Wright*, the Superintendent has inherent characteristic duties and powers to her constitutional office that carry over from Idaho's territorial days. As explained in both *Wright* and *Williams*, the characteristic duties belonging to a constitutional officer—those never repealed or expounded on by the Constitution—cannot be taken away by the Legislature. Yet, discerning and defining these duties is difficult given the unfortunately amorphous characteristic of the office, as defined in the Constitution and the territorial laws of long ago. Indeed, what the Superintendent now describes as "residual powers" can be lost and become merely vestigial powers if they are later delegated by the Constitution to another constitutional office. While the Idaho Constitution is silent as to the duties and powers of the Superintendent, it specifically assigned any general supervisory powers the Superintendent once had before

12

statehood to the Board. Additionally, the Idaho Constitution expressly provides that the Superintendent's role will be further defined by the Legislature. Thus, any powers the Superintendent possessed during the territorial period of Idaho that were assigned to the Board by the delegates to the Constitutional Convention are now merely vestigial because they did not survive to grant the Superintendent the broad powers she now seeks for "leading, directing and supervising the public and secondary schools of Idaho." As this Court held in *Evans*, the Board is "the *single* constitutionally mandated board of authority to act as a whole body *on all educational issues*." 124 Idaho at 10, 855 P.2d at 471 (emphasis added). To accept the Superintendent's argument and reach back to her vestigial territorial duties would essentially equate the Superintendent's powers with those of the Board and divide the Board's constitutional authority, a course soundly rejected by the *Evans* Court for violating Article IX, Section 2.

*Wright* and *Williams* can be further distinguished in two fundamental ways. First, in *Wright* the State Auditor could point to an equivalent position with identical duties in the Idaho Territory to compare. Here, although the Superintendent also has a territorial counterpart, there is little about the role of territorial Superintendent prior to statehood that would be analogous to the current Superintendent's constitutional relationship with the Board. The Superintendent cannot rely on the vestigial functions of the territorial office where the scheme was completely changed by Article IX, Section 2 of the Idaho Constitution. Second, the Legislature in *Williams* took it upon itself to restrict the auditor's post-audit functions through the appropriations process without express constitutional authority, whereas here, the Idaho Constitution expressly authorizes the Legislature to prescribe the laws concerning both the Superintendent's duties in Article IV, Section 1, and the Board's "membership, powers and duties" in Article IX, Section 2.

As a result of the Constitution's reassignment of some of the Superintendent's authority over educational matters to the Board, the Legislature passed various acts that define the Superintendent's current duties, powers, and limitations pursuant to Article IX, Section 2. *See, e.g.,* I.C. § 33-125. Importantly, the Superintendent has always been a constitutionally-mandated member of the Board. As an ex officio member, the Superintendent has voting powers and acts as the executive secretary in all elementary and secondary school matters. I.C. § 33-102. Additionally, the Superintendent—not the Board—is required in December of every year to "report to the governor and provide the state board with a copy thereof, on the condition of the public schools, the amount of the state school fund apportioned and sources from which derived,

13

with such suggestions and recommendations relating to the affairs of [her] office as [s]he may think proper." I.C. § 67-1506. Most importantly, the Superintendent presides over the Department of Education, which is an executive agency of the Board.

As a constitutional officer also serving as one of the Board's policy-makers, the Superintendent is the key executive authorized to carry out the Board's educational policies and procedures. Thus, we repeat for emphasis that the previously quoted language from Idaho Code section 33-125 captures the essence of the Superintendent's constitutional office:

> The state superintendent shall serve as the executive officer of [the state] department [of education] and shall have the responsibility for carrying out policies, procedures and duties authorized by law or established by the state board of education for all elementary and secondary school matters, and to administer grants for the promotion of science education as provided in sections 33-128 and 33-129, Idaho Code.

These are significant and meaningful duties that are clearly unique to the Superintendent's office. Altogether, notwithstanding the historic and ongoing tension between the Superintendent, the Board, and the Legislature, it appears that a constitutional line of demarcation was drawn in 1912 and has been in effect ever since. As a result, the Board sets educational policy for the state and holds the authority of "general supervision" over the state educational institutions and public school systems, while the Superintendent carries out the day-to-day "policies, procedures and duties authorized by law or established by the state board of education." IDAHO CONST. art. IX, § 2; I.C. § 33-125. To be clear, we find these duties to be the core functions of the Superintendent, and acknowledge the constitutional limits on the Legislature's authority to undermine those core functions.

This Court is charged with applying a presumption in favor of the constitutionality of legislative enactments; thus, our "power to declare legislative action unconstitutional should be exercised only in clear cases." *Leavitt*, 154 Idaho at 665, 302 P.3d at 5 (quoting *Stuart*, 149 Idaho at 40, 232 P.3d at 818). The Appropriation Bills at issue here do not prohibit the Superintendent from executing the policies, procedures, and duties authorized by law and the Board, nor do the Bills unconstitutionally delegate any of the Superintendent's inherent powers to the Board. Indeed, the Appropriation Bills at issue are ancillary to Idaho Code section 33-133(2)-(3), wherein the Legislature charged "the Board" in 2014 with the collection and safeguarding of student data for the purpose of complying with federal privacy standards for student records. *See* 20 U.S.C. § 1232g (The Family Educational Rights and Privacy Act (FERPA)). Interestingly,

14

this legislative directive has gone unchallenged by the Superintendent despite its language clearly establishing the Board, not the Superintendent, as the entity ultimately responsible for the security of data. Additionally, the Board earlier promulgated rules delegating the collection of such data to the Department in 2009. IDAPA 08.02.03.115. The Superintendent has failed to explain how the Board would have the authority to delegate such powers to her if they were powers she already possessed independent of the Board.

We have long held that "[t]he [L]egislature has absolute control over the finances of the state," except as limited by the Constitution. *Davis v. Moon*, 77 Idaho 146, 151, 289 P.2d 614, 617 (1955). Therefore, because the Appropriation Bills were a constitutional shift of funding from the Department to the Board, we will not disturb them. Contrary to the allegations of the Superintendent, the Legislature has not gutted the Department nor has she lost her entire IT department. Rather, the Legislature has shifted the bulk of the Technology Group's funding and positions to the central educational policy maker in the state—the Board—which can now directly access the information to set policy and provide "general supervision" of the state's public schools. IDAHO CONST. art. IX, § 2. The Superintendent will retain full access to this data because she sits as an ex officio member of the Board. There can be no question that the Idaho Constitution clearly allows the Superintendent, by virtue of her office and as one of the policy makers on the Board, the right to access this data.

In sum, by bringing this petition, the Superintendent is attempting to refight a constitutional battle that was first lost over 130 years ago when the Idaho Constitutional Convention vested the power of "general supervision" with the Board in Article IX, Section 2, and then lost once again in 1912 when those provisions were further amended by the Legislature and the people of Idaho. We acknowledge that the changes in funding and Department operations brought about by the Appropriation Bills will likely cause some initial disruption and create difficult administrative challenges for both the Superintendent and the Department. Nevertheless, whether this transfer of employees and funding to facilitate the centralization of data within the Board was a wise course is ultimately a policy question for our sister branches of government—one which they may be called upon to answer in the future.

In light of this decision upholding the constitutionality of the Appropriation Bills, we need not address the Superintendent's request for a writ of mandamus or writ of prohibition.

C. **Attorney Fees**

The Legislature and the Superintendent are seeking an award of attorney fees under Idaho Code section 12-121. The Superintendent also argues she is entitled to attorney fees under Idaho Code section 12-117. Both of these statutes authorize attorney fees in mandamus proceedings. *See Denney*, 161 Idaho at 524–26, 387 P.3d at 777–79. First, section 12-121 permits the Court to award attorney fees "in any civil action . . . to the prevailing party or parties when [it] finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation." Although we ultimately disagreed with the Superintendent's position, she raised legitimate questions about the nature of the constitutional duties of her office that have never before been clearly delineated. Therefore, we will not award attorney fees under section 12-121 because we do not find her petition was frivolous, unreasonable, or brought without foundation.

Second, section 12-117(1) mandates an award of attorney fees to the prevailing party "in any proceeding involving as adverse parties a state agency or a political subdivision and a person, . . . if [the Court] finds that the nonprevailing party acted without a reasonable basis in fact or law." Neither the Legislature nor an executive officer listed in Article IV, Section 1 of the Idaho Constitution qualify as a "state agency" under section 12-117(1), but a state board does. *See Denney*, 161 Idaho at 524, 387 P.3d at 777; I.C. § 67-5201(2). Thus, the requirements for an adverse proceeding between a person (the Superintendent) and the state agency (the Board) are met here. However, the Superintendent is not the prevailing party in this action and the Board did not seek fees under this section. Thus, we decline to award attorney fees under section 12-117.

## IV. CONCLUSION

For the foregoing reasons, we hold that Senate Bills 1409 and 1410 are constitutional. Accordingly, we dismiss the Superintendent's petition for a declaratory judgment and deny her requests for the extraordinary writs. Costs are awarded to Respondents.

Chief Justice BURDICK, Justices BRODY, BEVAN and STEGNER **CONCUR.**

16