# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 52636-2025

| | |
|---|---|
| Re: Verified Petition for Writs of Certiorari and Mandamus. ) <br> ------------------------------------------- ) <br> IDAHOANS UNITED FOR WOMEN AND ) <br> FAMILIES, ) <br> ) <br>   Petitioner, ) <br> ) <br> v. ) <br> ) <br> RAUL LABRADOR, in his official capacity as ) <br> the Idaho Attorney General; PHIL ) <br> MCGRANE, in his official capacity as the ) <br> Idaho Secretary of State; LORI WOLFF, in ) <br> her official capacity as the Administrator of ) <br> the Idaho Division of Financial Management; ) <br> and the IDAHO DIVISION OF FINANCIAL ) <br> MANAGEMENT, ) <br> ) <br>   Respondents. ) <br> ) | Boise, April 2025 Term <br><br> Opinion filed: June 24, 2025 <br><br> Melanie Gagnepain, Clerk <br><br> SUBSTITUTE OPINION, THE OPINION DATED JUNE 16, 2025, IS WITHDRAWN |

Original proceeding in the Idaho Supreme Court seeking writs of certiorari and mandamus.

Petitioner's Verified Petition against the Idaho Secretary of State is <u>dismissed</u>; its Verified Petition for a Writ of Mandamus against the Idaho Attorney General and the Idaho Division of Financial Management is <u>partially granted</u>; and its Verified Petition for a Writ of Certiorari against the Idaho Attorney General and the Idaho Division of Financial Management is <u>denied</u>.

Holland & Hart LLP, Boise, for Petitioner. Anne Henderson Haws argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondents. Alan M. Hurst argued.

---

ZAHN, Justice.

This original action concerns the fiscal impact statement and ballot titles for a citizen initiative entitled the "Reproductive Freedom and Privacy Act" ("Initiative"). Petitioner, Idahoans

United for Women and Families ("Idahoans United"), filed this original action seeking a writ of certiorari and writ of mandamus ordering the Idaho Division of Financial Management ("DFM") to revise its Fiscal Impact Statement ("FIS") and ordering the Idaho Attorney General to revise his long and short ballot titles. Idahoans United also seeks a writ against the Idaho Secretary of State but does not specify which writ is requested or what it seeks to compel.

After considering the arguments of counsel, we agree with some, but not all, of Idahoans United's arguments. For the reasons explained below, we dismiss the Petition against the Secretary of State because Idahoans United has failed to properly invoke our original jurisdiction. We partially grant the request for a writ of mandamus against DFM because the FIS fails to substantially comply with Idaho Code section 34-1812. We partially grant the request for a writ of mandamus against the Idaho Attorney General because the short ballot title fails to substantially comply with Idaho Code section 34-1809. However, we deny the request for a writ of mandamus as it pertains to the long ballot title because it substantially complies with Idaho Code section 34-1809.

## I. BRIEF SUMMARY

Article III, section 1 of the Idaho Constitution reserves to the people the power to legislate directly through the initiative process, under such conditions and in such manner as provided by laws enacted by the Idaho Legislature. Idaho law requires citizens to first submit a copy of the initiative petition to the Idaho Secretary of State. Idaho law then triggers a series of events that must occur within specified timeframes. One is DFM's preparation of an FIS. Another is the Attorney General's preparation of short and long ballot titles. Idaho law identifies mandatory requirements for both the FIS and the ballot titles.

Idahoans United filed a Petition with this Court, seeking a writ of mandamus or writ of certiorari against DFM, the Attorney General, and the Secretary of State. Idahoans United argues that neither the FIS nor the ballot titles for the Initiative meet the requirements of Idaho law. It asks this Court to either certify the FIS and ballot titles it has prepared or order DFM and the Attorney General to prepare a new FIS and new ballot titles that substantially comply with Idaho law.

For reasons we discuss in more detail below, we partially grant the requested writ of mandamus against DFM. We conclude that the FIS fails to substantially comply with the requirements of Idaho Code section 34-1812 because DFM has failed to establish a factual basis

2

for its estimated fiscal impact. We also conclude that the FIS fails to substantially comply with the clear and concise requirement of the statute because it contains conflicting statements concerning whether there will be a fiscal impact on the budget of the Idaho Department of Correction, and its reference to the state Medicaid budget creates confusion concerning the total fiscal impact. Finally, we conclude that the FIS fails to substantially comply with the statutory requirement to avoid legal and technical terms whenever possible because it includes unnecessary references to state statutes and a vague mention of "Medicaid references." However, we deny the requested writ concerning the references to the Medicaid and prisoner populations. We conclude those references substantially comply with the statutory requirement to provide an explanation of the assumptions underlying any estimated fiscal impact.

As to the Attorney General, we partially grant and partially deny Idahoans United's Petition seeking a writ of mandamus. We conclude that the Attorney General's short ballot title fails to substantially comply with the distinctive and comprehensive requirement of Idaho Code section 34-1809 because it fails to alert a prospective signer of the Initiative to the Initiative's four distinctive characteristics. However, we deny the requested writ concerning the use of "fetus viability" in the short ballot title. We conclude that the short title substantially complies with the statutory requirement to use language by which the Initiative is commonly referred. The phrase to which Idahoans United objects, "fetus viability," has been used in Idaho before. While Idahoans United's preferred term, "fetal viability," has been used more frequently, the meaning of the two phrases does not substantially differ and they simply use different parts of speech for the same word. We therefore conclude that the short title substantially complies with section 34-1809. We deny the requested writ concerning the long ballot title and conclude that it substantially complies with the statutory requirements.

For the reasons explained below, we decline to certify Idahoans United's proffered ballot titles and FIS. This Court has previously declined to dictate the form of ballot titles because it is not our job to determine the best way to draft a ballot title. Rather, our job is to determine whether the ballot titles substantially comply with the requirements of Idaho law. The same holds true for the FIS. Therefore, we remand the short ballot title to the Attorney General and the FIS to DFM. We order them to provide us with a revised short ballot title and a revised FIS by 4 p.m. MDT on June 23, 2025. To avoid further litigation and to finalize the FIS as quickly as possible, we also

3

order DFM to submit a sworn declaration by the preparer of the FIS describing the process utilized, including the evidence gathered and the assumptions utilized to create the FIS.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Idahoans United is attempting to qualify a voter initiative entitled the "Reproductive Freedom and Privacy Act" to appear on the 2026 general election ballot. On November 20, 2024, Idahoans United submitted the Initiative to the Secretary of State. When an initiative petition is submitted to the Secretary of State, "Idaho law trigger[s] a series of events, which must occur within specific timeframes." *Idahoans for Open Primaries v. Labrador* (*In re Verified Pet. for Writs of Cert. & Mandamus*) ("*Open Primaries*"), 172 Idaho 466, 473, 533 P.3d 1262, 1269 (2023).

Upon receiving an initiative petition, the Secretary of State must immediately transmit a copy of the initiative to DFM for the issuance of an FIS under Idaho Code section 34-1812. I.C. § 34-1804(2). DFM has twenty days from its receipt of the initiative petition to write and file an FIS with the Secretary of State's office. I.C. § 34-1812(1). The Secretary of State then must immediately transmit the FIS to the party who filed the initiative. *Id.*

When soliciting signatures for an initiative, signature gatherers must offer a copy of the FIS summary to electors. I.C. § 34-1812(3). The FIS summary must also be published in the state voters' pamphlet and on the official ballot. *Id.* The FIS summary and the detailed FIS must be available to the public on the Secretary of State's website "no later than August 1." *Id.*

Upon receiving the initiative petition, the Secretary of State must also transmit a copy of the initiative to the Attorney General for the issuance of a certificate of review under Idaho Code section 34-1809. I.C. § 34-1804(1). Upon receipt of the initiative petition, the Attorney General has twenty days to review the initiative, to "recommend to the petitioner such revision or alteration of the measure as may be deemed necessary and appropriate," and to issue a certificate of review to the Secretary of State. I.C. § 34-1809(1)(a), (c).

If the party who filed the initiative chooses to proceed, the proponent has fifteen days to file the initiative with the Secretary of State for the issuance of ballot titles. I.C. § 34-1809(2). The Secretary of State must immediately submit the initiative to the Attorney General to assign ballot

4

titles. *Id.* The Attorney General must then prepare a short and a long ballot title[1] and submit them to the Secretary of State within ten days. I.C. § 34-1809(2)(a), (d). The Secretary of State must then provide the ballot titles to the party who filed the initiative. I.C. § 34-1809(2)(b). "The ballot titles shall be used and printed on the covers of the petition when in circulation[.]" I.C. § 34-1809(2)(c).

In this action, the Secretary of State transmitted the Initiative to DFM, which prepared an FIS that projected additional costs to the State if voters approved the Initiative:

> The laws affected by the initiative would not impact income, sales, or product taxes. There is no revenue impact to the General Fund found.
>
> The initiative could change state expenditures in minor ways. Costs associated with the Medicaid and prisoner populations may occur; see Idaho Codes 20-237B and 56-255 and the Medicaid references from Health and Welfare.
>
> Passage of this initiative is likely to cost less than $20,000 per year. The Medicaid budget for providing services was about $850 million in FY2024. If passed, nominal costs in the context of the affected total budget are insignificant to the state.
>
> Assumptions
>
> Changes in costs associated with the ballot initiative could impact state funding expenditures for Corrections [sic] and Medicaid budgets. The amount of those costs would be dependent on the frequency of need for reproductive services within the agencies. The manner of the budget impacts would be different for Corrections [sic] due to the health care provisions used by the agency; there is no expected changes to the Corrections [sic] health care budget. Billing history prior to the Dobbs decision suggests that $20,000 per year is a conservative over-estimate of the costs. Neither of these agencies reverted funding when the Dobbs decision was made in 2022 (and already established legislation in Idaho code took effect). It is assumed that any additional costs due to the passage of this ballot initiative could be absorbed in the Corrections [sic] and Health and Welfare budgets should the ballot initiative pass.

Idahoans United filed the Initiative with the Secretary of State for the assignment of ballot titles. The Attorney General sent the ballot titles to the Secretary of State, and the Secretary of State provided them to Idahoans United that same day. The short ballot title states:

> Measure establishing a right to abortion up to fetus viability and to make reproductive decisions regarding one's own body.

---

[1] Idaho Code section 34-1809 refers to the ballot titles as the "short title" and "general title." The parties and prior decisions of this Court often colloquially refer to the general title as the "long title." This opinion will similarly use the term "long title" to refer to the general title.

The long ballot title states:

> The measure seeks to change Idaho's laws by introducing a right to reproductive freedom and privacy including a right to abortion up to the point of the fetus's ability to survive outside the womb. After fetal viability, there would be no general right to abortion except in cases of "medical emergency." The "medical emergency" exception would expand Idaho's current life exception and allow abortions when pregnant women face complicating physical conditions that threaten their life or health, "including serious impairment to a bodily function" or "serious dysfunction of any bodily organ or part."

> The proposed measure codifies a right to make reproductive decisions, including contraception, fertility treatment, and prenatal and postpartum care. This includes a "right of privacy" in making these decisions. The measure seeks to prevent the state from enforcing certain abortion laws protecting the life of the unborn child. It would also impose a requirement that any restrictions on reproductive decisions, including abortion prior to fetus viability, must be "narrowly tailored to improve or maintain the health of the person seeking reproductive health care." The measure would also prevent the state from penalizing patients, healthcare providers, or anyone who assists in exercising the proposed right.

After receiving the ballot titles, Idahoans United filed a Verified Petition for Writs of Certiorari and Mandamus with this Court, arguing that the FIS and the short and long ballot titles violate Idaho law. Idahoans United asks this Court to issue a writ of certiorari or mandamus directing DFM to issue the proposed FIS prepared by Idahoans United or to issue an FIS that complies with Idaho law. It also asks this Court to issue a writ of certiorari or mandamus certifying the ballot titles prepared by Idahoans United or directing the Attorney General to provide ballot titles that comply with Idaho law.

## III.    ISSUES ON APPEAL

1. Whether Idahoans United has properly invoked this Court's original jurisdiction.
2. Whether the FIS substantially complies with Idaho Code section 34-1812.
3. Whether the short ballot title substantially complies with Idaho Code section 34-1809.
4. Whether the long ballot title substantially complies with Idaho Code section 34-1809.
5. Whether Idahoans United is entitled to attorney fees on appeal.

## IV.    ANALYSIS

**A. Idahoans United has properly invoked this Court's original jurisdiction to issue a writ of mandamus.**

Idahoans United seeks writs of mandamus and of certiorari from this Court. Our jurisdiction to issue the writs stems from Article V, section 9 of the Idaho Constitution, which

states that "[t]he Supreme Court shall . . . have original jurisdiction to issue writs of mandamus, certiorari, prohibition, and habeas corpus, and all writs necessary or proper to the complete exercise of its appellate jurisdiction." Before this Court will exercise its original jurisdiction to issue a writ, the petitioning party must demonstrate that the elements of the writ are met. *Labrador v. Idahoans for Open Primaries*, ___ Idaho ___, ___, 554 P.3d 85, 90 (2024).

A writ of mandamus "may be issued by the [S]upreme [C]ourt . . . to compel the performance of an act which the law especially enjoins as a duty resulting from an office, trust or station[.]" I.C. § 7-302. The writ of certiorari may be granted when an inferior tribunal, board or officer exercising judicial functions has exceeded its jurisdiction. I.C. §§ 7-201, 7-202. "It is only appropriate for a court to issue an extraordinary writ 'where there is not a plain, speedy and adequate remedy in the ordinary course of law.' " *Idaho State Athletic Comm'n ex rel. Stoddard v. Off. of the Admin. Rules Coordinator*, 173 Idaho 384, 393, 542 P.3d 718, 727 (2024) (quoting *Westover v. Cundick*, 161 Idaho 933, 936, 393 P.3d 593, 596 (2017)); I.C. §§ 7-303, 7-402. We conclude that Idahoans United has failed to demonstrate these elements are met with regard to the Secretary of State. However, it has demonstrated that the elements are met with regard to DFM and the Attorney General.

*1. We dismiss the Petition against the Secretary of State.*

Idahoans United asks this Court to issue a writ against the Secretary of State but does not specify which writ it seeks. It has not alleged that the Secretary of State has failed to comply with a clear legal duty or that the Secretary of State acted in a quasi-judicial function in excess of his jurisdiction. Instead, Idahoans United alleges that DFM and the Attorney General failed to perform the duties imposed by Idaho Code sections 34-1809 and 34-1812. They have made no such allegation concerning the Secretary of State. At oral argument, Idahoans United admitted that the Secretary of State has performed the ministerial duties required of him up to this point and that it named the Secretary of State as a party in this action out of "an abundance of caution." Idahoans United has failed to establish the elements required for a writ of mandamus or a writ of certiorari and we therefore dismiss the Petition against the Secretary of State.

*2. Idahoans United has properly invoked this Court's original jurisdiction to issue a writ of mandamus against DFM.*

Idahoans United also seeks a writ of mandamus against DFM. "[M]andamus is not a writ of right and the allowance or refusal to issue a writ of mandate is discretionary." *Coeur d'Alene Tribe v. Denney*, 161 Idaho 508, 512, 387 P.3d 761, 765 (2015). A writ of mandamus may be

issued by the Supreme Court "to compel the performance of an act which the law especially enjoins as a duty resulting from an office, trust or station[.]" I.C. § 7-302. "A writ of mandamus will lie if the officer against whom the writ is brought has a '*clear legal duty*' to perform the desired act, and if the act sought to be compelled is *ministerial or executive in nature.*" *Idaho State Athletic Comm'n*, 173 Idaho at 393, 542 P.3d at 727 (emphasis added) (citation omitted). Additionally, this Court will only issue an extraordinary writ "where there is not a plain, speedy and adequate remedy in the ordinary course of law." I.C. §§ 7-303, 7-402.

Idahoans United argues that a writ is proper here because DFM has a duty to prepare an FIS that complies with Idaho Code section 34-1809, that the FIS prepared by DFM is inaccurate and does not comply with the statute, and that Idahoans United cannot begin collecting signatures for the Initiative until it has a valid FIS. Idahoans United has submitted a declaration asserting that any delay in collecting signatures will hinder its chances of collecting enough signatures to qualify for the 2026 election. DFM argues that, while it has a clear duty to prepare an FIS, it has discretion in deciding the content of the FIS, so mandamus relief is not appropriate.

We conclude that Idahoans United has properly invoked this Court's original jurisdiction. The plain language of Idaho Code section 34-1812 imposes a clear legal duty on DFM to prepare an FIS that meets the mandatory requirements of the statute. Specifically, this statute enumerates those requirements as follows:

- It "*shall* prepare an unbiased, good faith statement of the fiscal impact of the law proposed by the initiative." I.C. § 34-1812(1) (emphasis added).
- It "*shall* describe any projected increase or decrease in revenues, costs, expenditures, or indebtedness that the state or local governments will experience if the ballot measure is approved by the voters." I.C. § 34-1812(2) (emphasis added).
- It "*shall* include both immediate expected fiscal impacts and an estimate of any state or local government long-term financial implications." *Id.* (emphasis added).
- It "*must* be written in clear and concise language and *shall* avoid legal and technical terms whenever possible." *Id.* (emphasis added).
- It "*must* include both a summary of the fiscal impact statement, not to exceed one hundred (100) words, and a more detailed statement of fiscal impact that includes the assumptions that were made to develop the fiscal impact." I.C. § 34-1812(3) (emphasis added).

DFM's statutory duty to prepare an FIS that meets these requirements is clear and non-discretionary as evidenced by the statute's repeated use of the words "shall" and "must." The preparation of the FIS is an act that is ministerial or executive in nature.

The fact that DFM exercises discretion in estimating the amount of any fiscal impact does not alter our conclusion that DFM has a clear legal duty to prepare an FIS that complies with section 34-1812. DFM is correct that, generally, a writ of mandamus is improper to review acts of discretion. *See Brady v. City of Homedale*, 130 Idaho 569, 571, 944 P.2d 704, 706 (1997). However, our caselaw is clear that in instances where there is a clear legal duty for an officer to act but the details of those actions are left to an officer's discretion, mandamus may still be proper. *See Beem v. Davis*, 31 Idaho 730, 736, 175 P. 959, 961 (1918) ("The fact that certain details are left to the discretion of the authorities does not prevent relief by mandamus."); *Moerder v. City of Moscow*, 74 Idaho 410, 415, 263 P.2d 993, 996 (1953) ("Public officials may, under some circumstances, be compelled by writ of mandate to perform their official duties, although the details of such performance are left to their discretion."); *Musser v. Higginson*, 125 Idaho 392, 394–96, 871 P.2d 809, 811–13 (1994) ("For more than three-quarters of a century, the Court has adhered to the following principle: The fact that certain details are left to the discretion of the authorities does not prevent relief by *mandamus*." (internal quotation marks and citation omitted)). That principle applies with equal force to the facts of this action. While DFM has discretion in preparing the contents of the FIS, it has no discretion concerning whether to prepare an FIS that meets the requirements of section 34-1812.

We also conclude that Idahoans United has demonstrated that "there is not a plain, speedy and adequate remedy in the ordinary course of law." I.C. §§ 7-303, 7-402. In *Open Primaries*, we held that a petitioner's inability to begin collecting signatures for its initiative until the Secretary of State certifies the ballot titles was sufficient to invoke this Court's original jurisdiction. *Idahoans for Open Primaries v. Labrador* (*In re Verified Pet. for Writs of Cert. & Mandamus*) ("*Open Primaries*"), 172 Idaho 466, 475–76, 533 P.3d 1262, 1271–72 (2023). This action presents a similar situation because Idahoans United is prevented from collecting signatures until the Secretary of State certifies an FIS. I.C. § 34-1802(1); *see also Buchin v. Lance* (*In re Writ of Prohibition Entitled "Ballot Title Challenge Oral Arg. Req."*), 128 Idaho 266, 273, 912 P.2d 634, 641 (1995) (holding that "any signature collected by the circulation of a petition with . . . invalid titles cannot be valid"). Idahoans United also submitted a declaration from its executive director,

Melanie Folwell, which asserts that any delay in collecting signatures will adversely impact its efforts to qualify the Initiative for the 2026 general election. Having demonstrated both the elements of a writ of mandamus and the lack of an adequate remedy, we hold that Idahoans United has properly invoked this Court's original jurisdiction.

We decline DFM's invitation to adopt the reasoning of a recent Washington Supreme Court decision that dismissed a petition for a writ of mandamus seeking to prevent the publication of a public investment impact disclosure for several ballot initiatives. *See Walsh v. Hobbs*, 557 P.3d 701, 703, 706 (Wash. 2024) (en banc). While the Washington Supreme Court may have reached a different result under its precedent, we apply this Court's precedent and conclude that Idahoans United has properly invoked our original jurisdiction.

Idahoans United also seeks writs of certiorari against DFM and the Attorney General. We decline to separately analyze the elements of those writs because mandamus relief fully resolves Idahoans United's claim. In this action, the resolution of both writs turns on whether the FIS substantially complies with section 34-1812. The relief that Idahoans United seeks for each writ is the same: a writ requiring DFM to prepare an FIS that substantially complies with the requirements of section 34-1812. We have already held that Idahoans United properly invoked our original jurisdiction to issue a writ of mandamus. Thus, if the FIS substantially complies, then Idahoans United is not entitled to a writ of mandamus. The result would be no different for the requested writ of certiorari. If the FIS does not substantially comply, then Idahoans United is entitled to a writ of mandamus. A writ of certiorari would not award any greater relief than the requested writ of mandamus. Given that the outcomes would be the same for either writ, and given our conclusion that Idahoans United properly invoked this Court's original jurisdiction on the writ of mandamus, we do not need to address its claim for a writ of certiorari. We therefore deny Idahoans United's request for a writ of certiorari as duplicative of the relief sought in its request for a writ of mandamus.

3. *Idahoans United has properly invoked this Court's original jurisdiction to issue a writ of mandamus against the Attorney General.*

Finally, Idahoans United seeks a writ of mandamus against the Attorney General. The Attorney General does not challenge this Court's jurisdiction to issue a writ of mandamus concerning the ballot titles. We conclude that Idahoans United has properly invoked our original jurisdiction to issue a writ of mandamus against the Attorney General.

10

Section 34-1809 mandates that "the attorney general *shall* provide ballot titles," I.C. § 34-1809(2)(a) (emphasis added), that "*shall* contain: . . . [a] [d]istinctive short title not exceeding twenty (20) words by which the measure is commonly referred to or spoken of" and "[a] general title expressing in not more than two hundred (200) words the purpose of the measure," I.C. § 34-1809(2)(d)(i), (ii) (emphasis added). Section 34-1809 also mandates that, "[i]n making the ballot title, the attorney general *shall*, to the best of his ability, give a true and impartial statement of the purpose of the measure and in such language that the ballot title *shall* not be intentionally an argument or likely to create prejudice either for or against the measure." I.C. § 34-1809(2)(e) (emphasis added).

Idahoans United has properly pleaded that section 34-1809 imposes a clear legal duty on the Attorney General to prepare ballot titles that meet the mandatory requirements of the statute. The preparation of the ballot titles is an act that is ministerial or executive in nature. And for the reasons discussed above regarding Idahoans United's petition against DFM, we conclude that Idahoans United has properly demonstrated that "there is not a plain, speedy and adequate remedy in the ordinary course of law" with regard to the ballot titles. Further, for the reasons discussed above, we deny its request for a writ of certiorari as duplicative of its request for a writ of mandamus.

## B. The FIS does not substantially comply with Idaho Code section 34-1812.

Idahoans United argues that the FIS prepared by DFM fails to comply with Idaho Code section 34-1812. The statute requires DFM to prepare "an unbiased, good faith statement of the fiscal impact of the law proposed by the initiative." I.C. § 34-1812(1). It must include both a 100-word summary of the statement and a more detailed statement of fiscal impact that includes the assumptions that were made to develop the fiscal impact. I.C. § 34-1812(3). The FIS "must be written in clear and concise language and shall avoid legal and technical terms whenever possible. Where appropriate, [an FIS] may include both estimated dollar amounts and a description placing the estimated dollar amounts into context." I.C. § 34-1812(2). Idahoans United argues that the FIS prepared for the Initiative violates these requirements because it was not made in good faith, is unclear, and impermissibly includes legal and technical terms.

Before we address the specific challenges raised by Idahoans United, we first must determine the appropriate legal standard to apply. In *Open Primaries*, we determined that we would employ a "substantial compliance" standard when reviewing ballot titles prepared by the

11

Attorney General. 172 Idaho at 479, 533 P.3d at 1275. We concluded this standard was appropriate because we had applied it in other situations where the critical inquiry was whether a party had met statutory requirements. *Id.* Idahoans United's arguments here require us to engage in a similar critical inquiry: whether DFM has fulfilled its mandatory duties set forth in section 34-1812. As a result, we conclude that our reasoning expressed in *Open Primaries* applies with equal force here. Therefore, we will review the FIS to determine whether it substantially complies with the requirements of Idaho Code section 34-1812.

We now turn to the specifics of Idahoans United's challenge. It claims that the FIS fails to meet nearly every statutory requirement:

- It is not drafted in good faith because it estimates a fiscal impact on taxpayers despite language in the Initiative that it "does not create a financial obligation on the state, its agencies, or their programs." It also lacks a factual basis for its conclusions that there may be a fiscal impact on the Idaho Department of Correction ("IDOC") and Medicaid budgets.

- It is not clear and concise because it creates confusion regarding whether there will be a fiscal impact.

- It fails to avoid legal and technical terms whenever possible because it cites statutes and regulatory references.

- It is prejudicial because it unnecessarily references Medicaid and prisoner populations and the Idaho Department of Health and Welfare's ("IDHW") total Medicaid budget.

We address each argument in turn.

*1. The FIS does not substantially comply with the good faith requirement.*

Idahoans United argues that the FIS fails to substantially comply with the requirements of section 34-1812 because there is no factual basis supporting the estimated fiscal impact and the Initiative specifically states that it will not impose a financial obligation on the State. DFM responds that it acted in good faith by consulting with a Medicaid expert from IDHW.

We hold that the FIS does not substantially comply with the good faith requirement of section 34-1812 because DFM has not established a reasonable basis for its estimated fiscal impacts. Idaho Code section 34-1812 requires DFM to "prepare an *unbiased, good faith* statement of the fiscal impact of the law proposed by the initiative." I.C. § 34-1812(1) (emphasis added). Good faith includes "honesty in belief or purpose" and "faithfulness to one's duty or obligation." *Good Faith*, Black's law Dictionary (12th ed. 2024). Section 34-1812 requires DFM to project and

12

estimate the potential fiscal impact. As such, the statute does not require certainty or exactness. However, the statute's requirement that the FIS be a "good faith statement" requires that it be more than a guess or speculation. In other words, while section 34-1812 does not require DFM to perfectly project the future, the requirement that the FIS be "a good faith statement" requires that DFM have a reasonable basis for its estimated fiscal impact.

In this case, the FIS posits that, if the Initiative passed, there may be a potential increase in state expenditures for the Medicaid and prisoner populations. However, the evidence in the record before us does not support these conclusions. As a result, the FIS fails to substantially comply with the good faith requirement of section 34-1812.

Both parties submitted evidence to this Court related to DFM's investigation of the fiscal impact of the Initiative. The evidence submitted includes DFM emails with Juliet Charron, the deputy director for Medicaid and Behavioral Health at IDHW. Those emails show that IDHW provided DFM data concerning abortion-related Medicaid claims for the years 2018 through 2022. The emails also indicate that a DFM economist had a phone call and a meeting with Charron. However, none of the materials indicate that DFM spoke with anyone at the IDOC or that it conducted any investigation of whether IDOC paid for any abortion-related care for the prisoner population. While DFM submitted several declarations to this Court, it did not provide a declaration from the economist who prepared the FIS or from anyone else at DFM to explain the evidence gathered, process employed, or reasoning underlying its FIS. DFM did submit two declarations from IDHW employees concerning abortion data and Medicaid claims data. We will evaluate the evidence before us to determine whether the FIS is a good faith statement, or put differently, whether DFM had a reasonable basis for the estimated fiscal impacts contained in the FIS.

Initially, we note that there is no evidence supporting the FIS's statement that there may be a fiscal impact to the IDOC budget due to increased costs for medical care for the prisoner population. There is no evidence that DFM communicated with IDOC or conducted any research relating to the IDOC budget and spending for abortion-related care provided to the prisoner population. As a result, it appears that the FIS's statement that the Initiative could increase the budget for prisoner medical care lacked a reasonable basis and, therefore, was entirely speculative. We hold that the FIS fails to substantially comply with the statutory requirement for a good faith statement as it relates to the estimated impact on the IDOC budget.

Next, we conclude that the FIS lacks a reasonable basis for the estimated impact on the Medicaid budget. While there is evidence that DFM investigated certain Medicaid costs, the evidence is insufficient to support the FIS's estimate that passage of the Initiative may result in additional state expenditures.

The emails between DFM and Charron include data concerning abortion-related Medicaid claims for the years 2018 through 2022:

2018: 2 claims billed, totaling $2,576; $0 paid

2019: 5 claims billed, totaling $9,795; $500 paid

2020: 4 claims billed, totaling $24,323; $9,591 paid

2021: 2 claims billed, totaling $13,806; $0 paid

2022: No claims billed

The emails do not describe what the claims were for or the reasons why the claim amounts were not fully covered by Medicaid.

DFM submitted to this Court a declaration from Miren M. Unsworth, IDHW's deputy director of the Health and Human Services Division. Unsworth's declaration provided data on the "Total Reported Idaho Abortions and Chemical Abortions by Year" between 2015 and 2023. That data indicated that beginning in 2022, the year the United States Supreme Court issued its decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), the number of Idaho resident abortions and chemical abortions decreased dramatically.

DFM also submitted to this Court a declaration from Charron. Charron testified that between July 2020 and June 2021, the average monthly enrollment for Idaho Medicaid of women between the ages of 14 and 45 was 97,055. She also testified that Idaho Medicaid provides coverage for treatment and follow-up care at hospitals following abortion complications, including complications from chemically-induced abortions. She stated that it is often difficult to quantify Idaho's costs for providing this coverage due to a variety of factors. She testified that Idaho Medicaid expended $3,025.94 in state funds to cover treatment and follow-up care for abortion-related medical complications in calendar year 2019, and $3,797.42 in state funds in calendar year 2022.

Idahoans United claims that the Initiative would not increase the State dollars expended by Idaho Medicaid on abortion-related claims for two reasons. First, the Initiative specifically states that it "does not create a financial obligation on the state, its agencies, or their programs to pay for,

14

fund, or subsidize the reproductive health care protected by this act." Second, federal and Idaho law significantly restrict the use of public funds for abortion and the Initiative does not change those laws.

The federal Hyde Amendment prohibits the Secretaries of Labor, Health and Human Services, and Education from utilizing federal funds for any abortion or health benefits coverage that covers abortions except in the case of rape or incest, or where the pregnancy places the mother in danger of death. *See* Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, § 506(a), 138 Stat. 460, 703 (2024). The Hyde Amendment is significant in this context because the bulk of Idaho's Medicaid spending is accomplished with federal funds. The Charron Declaration establishes that between July 2020 and July 2021, Idaho Medicaid expended $3.24 billion on all services for Medicaid participants. Of that total, $2.27 billion was federal funds. With regard to state funds, Idaho's "No Public Funds for Abortion Act" provides that no public funds made available by the State can be used to provide for abortions. I.C. § 18-8705(1), (2). Likewise, Idaho Code section 56-209c provides that "[n]o funds available to the department of health and welfare . . . shall be used to pay for abortions" except when necessary to save the life of the mother or in the case of rape or incest. I.C. § 56-209c. The Initiative does not purport to change these laws.

Idahoans United argues that there is no evidence that DFM analyzed whether Idaho Medicaid would be required to cover any additional abortion-related claims if the Initiative passed, given state and federal law restricting the use of public funds and the Initiative's language. DFM notes that Medicaid costs related to abortion complications "are nearly certain to materialize."

We conclude that, while DFM has some evidence indicating that the number of abortions would likely increase if the Initiative passed, it has not established a reasonable basis to support its estimated fiscal impact to the Idaho Medicaid program. DFM argues that there will be a fiscal impact because Medicaid expenses will increase due to complications related to an increased number of chemically induced abortions. However, DFM did not submit a declaration from the DFM economist that prepared the FIS explaining the basis for the estimated fiscal impact. As a result, we are left to review the evidence in the record to determine whether it provides a reasonable basis for the estimated fiscal impact to the Medicaid program. We conclude that it does not.

The only evidence in the record that it appears DFM had when it prepared the FIS are the emails between DFM and IDHW. Neither the Unsworth nor the Charron declarations indicate that the data contained in those declarations was provided to DFM prior to its preparation of the FIS.

15

The emails only contain data on abortion-related claims made to Idaho Medicaid and the amounts paid on those claims. As noted above, both federal and Idaho law permit Medicaid funds to be used for abortions necessary to save the life of the mother. Charron has also testified that Idaho Medicaid covers claims to treat abortion-related complications resulting from chemically induced abortions. But the emailed claims data does not indicate whether the Medicaid claims paid between 2018 and 2022 were for abortions to save the life of the mother, to treat abortion-related complications resulting from chemically induced abortions, or both. Without knowing how many of the previously paid claims were for abortion-related complications, it is unclear whether the claims data provides a reasonable basis for DFM's estimated fiscal impact on the Medicaid budget.

DFM also points to the Unsworth Declaration as support for its contention that the number of chemically induced abortions will increase. While the Unsworth Declaration indicates that Idaho residents had significantly more abortions before the *Dobbs* decision than after, those numbers fail to differentiate how many of the abortions involved Medicaid recipients. The numbers also fail to differentiate between abortions that Medicaid funds would cover and those that it would not. Finally, the numbers give no indication concerning how many of the women who received chemically induced abortions could be expected to experience abortion-related complications.

The evidence contained in the record does not provide a reasonable basis supporting the estimated fiscal impact to the Medicaid program if the Initiative passed. As previously discussed, Idaho Code section 34-1812 does not require certainty or exactness, but it requires more than speculation or a guess. While DFM consulted IDHW concerning Idaho Medicaid claims, the data received from IDHW is unclear whether there could be an increase in Idaho Medicaid claims for abortion-related complications if the Initiative passes. Given the lack of a reasonable basis in the record to support the estimated fiscal impact in the FIS, we hold that the estimated impact on the Medicaid program failed to substantially comply with the good faith statement requirement of section 34-1812.

Finally, we are not persuaded by Idahoans United's argument that the only good faith estimate is zero fiscal impact because the Initiative stated that it would not impose a financial obligation on the State. Idaho Code section 34-1812 does not require DFM to adopt the Initiative's stated fiscal impact. *See* I.C. § 34-1812. Rather, it authorizes DFM to prepare a good faith statement of the fiscal impact proposed by the law and in doing so, authorizes DFM to work "in

16

consultation with any other appropriate state or local agency." I.C. § 34-1812(1). DFM would fail to act in good faith if it simply adopted an initiative's assertion that it would have no financial impact. Rather, DFM must conduct its own investigation to prepare the FIS.

    2. *The FIS does not substantially comply with the clear and concise requirement.*

    Idahoans United also asserts that the FIS fails to substantially comply with the requirement that it "must be written in clear and concise language." I.C. § 34-1812(2). Idahoans United contends that the FIS contains conflicting statements concerning whether passage of the Initiative will result in increased expenditures. On one hand, the FIS states that:

- "Costs associated with the Medicaid and prisoner populations may occur,"

- "Passage of this initiative is likely to cost less than $20,000 per year," and

- "Changes in costs associated with the ballot initiative could impact state funding expenditures for Corrections [sic] and Medicaid budgets."

However, on the other hand, the FIS states:

- "[T]here is no expected changes to the Corrections [sic] health care budget," and

- "[A]ny additional costs due to the passage of this ballot initiative could be absorbed in the Corrections [sic] and Health and Welfare budgets should the ballot initiative pass."

Idahoans United argues that these conflicting statements are neither concise nor clear, and they create confusion concerning whether the Initiative will have a fiscal impact.

    We agree with Idahoans United that these conflicting statements in the FIS fail to substantially comply with the clear and concise requirement contained in section 34-1812(2). As quoted above, the FIS both asserts that passage of the Initiative may have a fiscal impact on the IDOC and Medicaid budgets and that there is no expected change to budgets, or changes could be absorbed in existing budgets. The inclusion of the conflicting statements not only causes confusion but also makes it longer than it would be without the conflicting statements. As a result, the FIS is neither clear nor concise.

    Additionally, Idahoans United argues that the FIS is unclear due to its reference to the $850 million Medicaid budget:

> Passage of the initiative is likely to cost less than $20,000 per year. The Medicaid budget for providing services was about $850 million in FY2024. If passed, nominal costs in the context of the affected total budget are insignificant to the state.

17

Idahoans United argues that inclusion of the Medicaid budget also creates prejudice against the Initiative. DFM argues that it included the Medicaid budget to put the Initiative's expected fiscal impact into context.

We conclude that the reference to the Medicaid budget also fails to substantially comply with the clear and concise requirement. While it is true that Idaho Code section 34-1812(2) allows the FIS to "include a description placing the estimated dollar amounts in context[,]" in the context of this FIS, the reference creates confusion. If we read the FIS to conclude that there are potential increases in IDOC expenditures, the FIS estimates a fiscal impact of $20,000 per year but it does not specify how much of the $20,000 is due to potential increases in IDOC expenditures versus potential increases in Medicaid expenditures. As a result, the total Medicaid budget cannot provide context for the $20,000 estimated impact because we do not know how much of that impact is due to Medicaid expenditures.

If we read the FIS to attribute the entire $20,000 impact to a potential increase in Medicaid expenditures, the total Medicaid budget does little to put that amount into context and undermines the clarity of other statements in the FIS. The FIS already indicates that the changes would be "minor" and "nominal." Listing the total Medicaid budget adds no clarity to this statement and tends to play to the passions of voters who may take issue with the size of the State's Medicaid budget. Instead, it requires citizens to recognize that the total impact is not $850 million and then do the math in their heads to determine how much the total impact is. If they did that math, the estimated increased expenditures are 0.000023% of the Medicaid budget. If the desire is to represent the scope of the impact through a percentage, then DFM should either stick with "nominal," or simply include the percentage and save voters from having to do a math problem in their heads while standing in a voting booth.

3. *The FIS does not substantially comply with the requirement to avoid legal and technical terms whenever possible.*

Idahoans United argues that DFM included unnecessary legal and technical terms by citing statutes:

> The initiative could change state expenditures in minor ways. Costs associated with the Medicaid and prisoner populations may occur; see Idaho Codes 20-237B and 56-255 and the Medicaid references from Health and Welfare.

It contends that the legal citations are unnecessary because the FIS does not explain why they apply to the Initiative. Their inclusion thus creates confusion. DFM responds that it is within its

discretion to decide whether legal terms are unavoidable. Here, it claims that providing the legal citations was necessary to convey what laws would contribute to costs in conjunction with the Initiative.

We hold that DFM's inclusion of legal citations in the FIS fails to substantially comply with the statutory requirement to "avoid legal and technical terms whenever possible." I.C. § 34-1812(2). The references do not assist the FIS in "describ[ing] any projected increase or decrease in revenues, costs, expenditures, or indebtedness" as required by the statute. I.C. § 34-1812(2). The cited statutes do not mention abortions. Rather, they provide that the State will pay for certain medical services. *See* I.C. §§ 20-237B, 56-255. The mention of "Medicaid references" is vague and unclear. The legal terms referencing statutes and vague Medicaid references do nothing to help explain the potential fiscal impact of the Initiative. Indeed, a citation to "see" a specified statute is of little use to a voter standing in a voting booth deciding how to vote.

For the forgoing reasons, we conclude that it was entirely possible for DFM to explain the estimated fiscal impact without including the legal citations.

4. *DFM's references to "Medicaid and prisoner populations" substantially comply with the statutory requirements.*

Finally, Idahoans United argues that DFM's references in the FIS to the "Medicaid and prisoner populations" will prejudice the Initiative because the public generally has a negative impression of those populations, and the references will therefore cause prejudice against the Initiative. DFM responds that "Medicaid and prisoner populations" are not legal or technical terms, and the references are included to provide an explanation of the source for the increased expenditures.

We hold that DFM's use of the terms "Medicaid and prisoner populations" substantially complies with the requirements of Idaho Code section 34-1812. DFM's estimated fiscal impact for the Initiative was based on assumptions related to Idaho's prisoner population and Medicaid recipients. DFM's inclusion of this information substantially complies with the statute because it explains the basis for the estimated fiscal impact.

To summarize, we agree with some, but not all, of Idahoans United's arguments concerning the FIS. We hold that the FIS does not substantially comply with the requirements of Idaho Code section 34-1812 because its estimate lacks a good faith basis, it is not clear, and it unnecessarily includes legal terms. However, we conclude that references to the Medicaid and prisoner

populations do not prejudice the Initiative and therefore substantially comply with the statutory requirements applicable to the FIS.

## C. The short ballot title does not substantially comply with Idaho Code section 34-1809.

Idahoans United next argues that the short ballot title drafted by the Attorney General fails to comply with Idaho Code section 34-1809 because it uses uncommon terms and it is not distinctive or comprehensive. We agree with Idahoans United on the latter argument and hold that the short title does not substantially comply with Idaho Code section 34-1809 because it fails to capture all of the distinctive features of the Initiative.

As noted, Idaho Code section 34-1809 requires the Attorney General to draft ballot titles for voter initiatives. I.C. § 34-1809(2)(a). The ballot title must contain "a short title of no more than twenty (20) words . . . . The short title must provide a distinctive statement by which the measure would be commonly referred. *Buchin v. Lance* (*In re Writ of Prohibition Entitled "Ballot Title Challenge Oral Arg. Req."*), 128 Idaho 266, 269, 912 P.2d 634, 637 (1995) (citing I.C. § 34-1809). When reviewing ballot titles, this Court considers whether the Attorney General substantially complied with the requirements of section 34-1809. *Open Primaries*, 172 Idaho at 479, 533 P.3d at 1275. This Court has "long recognized that 'it is not the Court's role to find another way or the best way to draft a [ballot] title, but rather to examine the Attorney General's language and ask whether it expresses the purpose of the measure without being argumentative or prejudicial.' " *Id.* (quoting *Buchin*, 128 Idaho at 270, 912 P.2d at 638).

1. *The short title substantially complies with the statutory requirement to use language by which the Initiative is commonly referred.*

The Attorney General prepared the following short title for the Initiative:

Measure establishing a right to abortion up to fetus viability and to make reproductive decisions regarding one's own body.

Idahoans United argues that the short title fails to substantially comply with Idaho Code section 34-1809 because the phrase "fetus viability" is not language by which the measure is commonly referred or spoken of and it will therefore prejudice the Initiative. The Attorney General counters that the phrase "fetus viability" is a common phrase that substantially complies with the statute and is not argumentative or prejudicial.

We conclude that the phrase "fetus viability" has been used before in Idaho and is a variation of Idahoans United's suggested phrase "fetal viability." The two phrases employ different parts of speech for the same word and as such, the meaning of the two phrases does not

20

substantially differ. As a result, we hold that the short title substantially complies with the requirement that it use language by which the measure is commonly referred.

"The plain and unambiguous language of section 34-1809(2)(d)(i) requires the Attorney General to ascertain how an initiative is commonly referred to or spoken of and incorporate that language into the short title." *Open Primaries*, 172 Idaho at 481, 533 P.3d at 1277. "This task necessarily requires the Attorney General to determine how Idahoans commonly refer to and speak of the measure." *Id.* "When ascertaining the language used to commonly refer to the measure, the Attorney General must remain mindful that the statute requires him to use language that is not 'intentionally an argument or likely to create prejudice either for or against the measure.' " *Id.* (citing I.C. § 34-1809(2)(e)). The Attorney General can achieve this by, "to the best of his ability, giv[ing] a true and impartial statement of the purpose of the measure." I.C. § 34-1809(2)(e).

Idahoans United argues that the situation here is nearly identical to the one we addressed in our decision in *Open Primaries*. We disagree. In *Open Primaries*, this Court determined that the phrase "nonparty blanket primary" had not been used by any court in the United States, including the United States Supreme Court and that "it appear[ed] that the term [was] one of the Attorney General's own creation." *Id.* at 481, 533 P.3d at 1277. We also determined that the term would likely prejudice the initiative because it was confusingly similar to a different term used by the United States Supreme Court:

> The Supreme Court held that a "partisan blanket primary" is unconstitutional, but a "nonpartisan blanket primary" is constitutional. It has never discussed a "nonparty blanket primary." Using an undefined term that is very similar to, but slightly different from those discussed by the Supreme Court could cause a voter to conclude that the system proposed in the [i]nitiative has been or would be held unconstitutional, when in fact it has not.

*Id.* at 484, 533 P.3d at 1280.

The situation in *Open Primaries* is distinguishable from that in this action. First, the phrase "fetus viability" is not a new, undefined term of the Attorney General's own creation. In *Buchin*, the Attorney General advanced a ballot title that referred to a "viable fetus." *Buchin*, 128 Idaho at 269, 912 P.2d at 637. The parties did not challenge the use of that phrase, and this Court determined the ballot title was insufficient on other grounds. *Id.* at 272–73, 912 P.2d at 640–41. However, this Court wrote a ballot title that it "would deem acceptable[,]" which included the phrase "fetus viability." *Id.* at 273, 912 P.2d at 641. Thus, the phrase has been used in Idaho. Further, the Idaho Code discusses when a "fetus becomes viable" and a "viable fetus." I.C. § 18-604(13) to (15). As

21

a result, this action is distinguishable from *Open Primaries* because the challenged phrase is not one of the Attorney General's own creation and is one that has been used in Idaho.

This action is also distinguishable from *Open Primaries* because the phrase "fetus viability" is not likely to create confusion. In *Open Primaries*, we concluded that the Attorney General's terminology was likely to prejudice the initiative because it could confuse voters concerning the constitutionality of the initiative given its similarity to the name of two other voting systems discussed by the United States Supreme Court. *Id.* The short ballot title in this action is different. The words "fetus" and "fetal" are different parts of speech used for the same concept; one is a noun and the other is an adjective. *Fetus*, Merrium-Webster's Online Dictionary (assigning "fetus" as a noun); *Fetal*, Merrium-Webster's Online Dictionary (assigning "fetal" as an adjective, defined as "of, relating to, or being a *fetus*"). Regardless of which form of speech is used, the meaning is substantially the same and therefore not confusing. Applying the relevant legal standard, we hold that in this instance, the use of the term "fetus viability" substantially complies with the statutory requirement that the short title not create prejudice against the Initiative.

Next, Idahoans United argues that the phrase "*fetal* viability" is significantly more common in Idaho than the phrase "*fetus* viability." Idahoans United's argument may be persuasive if we employed a de novo standard to review the short ballot title. The applicable legal standard, however, is one of substantial compliance. *Open Primaries*, 172 Idaho at 479, 533 P.3d at 1275. Applying this standard does not involve reviewing the short title to determine if the Attorney General used the most common term, but instead whether the Attorney General accomplished the general purpose of the statute. We reiterate that "it is not the Court's role to find another way or the best way to draft a [ballot] title, but rather to examine the Attorney General's language and ask whether it expresses the purpose of the measure without being argumentative or prejudicial." *Id.* (quoting *Buchin*, 128 Idaho at 270, 912 P.2d at 638). Given that the phrase "fetus viability" has substantially the same meaning as Idahoans United's suggested phrase "fetal viability," and given that Idaho has some history of using the term "fetus viability," we hold that the short title substantially complies with the statute's common language requirement.

Idahoans United also argues that using the phrase "fetus viability" rather than "fetal viability" would prejudice the Initiative. It presented a declaration from Dr. Hillary Shulman, Ph.D., an associate professor at Ohio State University, who studies how word choice influences information processing and public engagement in politics. She opines that the individual term

22

"fetus" will lead people to have a more emotional response to the Initiative and thereby cause prejudice against it, while use of the term "fetal" would lead the public to have a more cognitive response.

The Attorney General first argues this Court may not consider Dr. Shulman's testimony because the expedited briefing schedule requested by Idahoans United causes difficulty in obtaining discovery concerning Idahoans United's expert and in obtaining a rebuttal expert. The Attorney General argues that the evidentiary record in this case should be limited to information the Attorney General could have considered when writing the ballot titles.

The Attorney General's arguments are unpersuasive. To the extent the Attorney General argues he is prejudiced by our consideration of the expert's testimony, he did not oppose Idahoans United's motion to expedite, move for expedited discovery concerning Dr. Shulman's report, or move for additional time to submit an opposing expert declaration. We observe that the Attorney General had more time to obtain an expert declaration than Idahoans United. Idahoans United only had twenty days to file its petition after receiving the ballot titles. I.C. § 34-1809(3)(a). After this Court granted the motion to expedite and set a briefing schedule, the Attorney General received an extension for the due date to file a response brief. The Attorney General thus had over a month to obtain a declaration from an opposing expert, which exceeded the twenty days Idahoans United had to prepare its expert's declaration. We find no prejudice to the Attorney General in this circumstance.

Nor has the Attorney General cited any rule of evidence precluding admission of the declaration or constraining our ability to consider it. In fact, when exercising our original jurisdiction, this Court often reviews evidence submitted in declarations so long as the testimony complies with the Idaho Rules of Evidence. *See, e.g.*, *Planned Parenthood Great Nw. v. State*, 171 Idaho 374, 398–99, 522 P.3d 1132, 1156–57 (2022); *Reclaim Idaho v. Denney*, 169 Idaho 406, 416–17, 497 P.3d 160, 170–71 (2021); *Ybarra v. Legislature by Bedke*, 166 Idaho 902, 907–08, 466 P.3d 421, 426–27 (2020). We therefore will consider the declaration of Idahoans United's expert.

However, nothing in the testimony of Idahoans United's expert alters our conclusion that the short title's use of "fetus viability" substantially complies with section 34-1809. Idahoans United's expert opines that the term "fetal" would be less likely to prejudice the Initiative. As previously discussed, the terms "fetus" and "fetal" are different parts of speech concerning the

same concept, so the meanings of the two phrases are substantially the same. As a result, we cannot conclude that fetus viability does not substantially comply, but fetal viability would. It bears repeating that we are not employing a de novo standard of review, and that it is not our role to determine whether the Attorney General used the best language for the short title. *See Open Primaries*, 172 Idaho at 486, 533 P.3d at 1262 ("While we understand that Petitioners would prefer different language, 'it is not the Court's role to find another way or the best way to draft a long title[.]' " (quoting *Buchin*, 128 Idaho at 270, 912 P.2d at 638)).

2. *The short title fails to substantially comply with the distinctive and comprehensive requirement.*

Idahoans United also argues that the short title is not distinctive and comprehensive because it omits two important characteristics of the Initiative: the right to abortion in medical emergencies and the right to privacy. The Attorney General contends that the short title is distinctive because it highlights the "[I]nitiative's most distinctive change to Idaho law." He claims that the Initiative includes too many distinctive features to fit in a twenty-word short title, but that the short title properly sets forth the general topic of the Initiative and informs potential signers of what they would be sponsoring.

"In drafting the short title, the Attorney General must, by force of circumstances, analyze and appraise the initiative in order to determine what the initiative means and its *distinctive* characteristics. *The short title is to be comprehensive in nature.*" *Buchin*, 128 Idaho at 270, 912 P.2d at 638 (emphasis added) (citing *In re The Pet. of Idaho State Fed'n of Labor (AFL)*, 75 Idaho 367, 373, 272 P.2d 707, 710 (1954)). "The Court has defined 'distinctive' as a statement that would refer to that which would distinguish one thing as it related to other things." *Id.* at 272, 912 P.2d at 640 (citing *AFL*, 75 Idaho at 373, 272 P.2d at 710). "[I]n order to be distinctive, a short title must communicate the chief characteristics of the initiative—including, when necessary how the initiative proposes to alter current law." *Open Primaries*, 172 Idaho at 482, 533 P.3d at 1278 (first citing *Buchin*, 128 Idaho at 272, 912 P.2d at 640; and then citing *Am. Civ. Liberties Union, Idaho Chapter v. Echohawk*, 124 Idaho 147, 151, 857 P.2d 626, 630 (1993)). "When assessing the sufficiency of a short title, the fundamental inquiry is whether the short title sets forth the characteristics which distinguish this proposed measure and expeditiously and accurately acquaint the prospective signer with what he or she is sponsoring." *Open Primaries*, 172 Idaho at 482, 533 P.3d at 1278 (cleaned up) (quoting *Echohawk*, 124 Idaho at 151, 857 P.2d at 630).

24

The Attorney General claims that there are at least ten key characteristics in the Initiative and they cannot all be included in the short title. In contrast, Idahoans United argues that there are three key characteristics in the Initiative and that the short title fails to acknowledge two of them. We conclude that the Initiative contains four distinctive characteristics because it proposes four changes to existing Idaho law:

- It establishes a statutory right to abortion before the viability of the fetus.

    Idaho law currently criminalizes the termination or attempted termination of a clinically diagnosable pregnancy except when "necessary to prevent the death of the pregnant woman" or during the first trimester in certain cases of rape or incest. I.C. § 18-622(2)(a)(i). The Initiative would create an unfettered right to abortion <u>prior to fetal viability</u>, which the Initiative defines as the point when "the fetus has a significant likelihood of sustained survival outside of the uterus without extraordinary medical measures."

- It establishes a statutory right to abortion after fetal viability to protect the health of the mother.

    As discussed above, existing Idaho law only permits the termination of a clinically diagnosable pregnancy in limited circumstances. I.C. § 18-622(2)(a)(i). The Initiative proposes to change Idaho law by allowing abortions <u>after fetal viability</u> if continued pregnancy may "place the health of the pregnant patient in serious jeopardy," "cause serious impairment to a bodily function," or "cause serious dysfunction of any bodily organ."

- It establishes statutory protections for healthcare providers.

    Idaho law currently states it is a crime to perform or attempt to perform an abortion. I.C. § 18-622(1). Further, healthcare professionals who perform, attempt to perform or assist in performing an abortion may have their professional licenses suspended. *Id.* The Initiative would limit the criminal and licensure liability of healthcare providers: "[i]n no case may reproductive health care provided consistent with this act by a health care provider be a basis for professional discipline, civil liability, or criminal liability."

- It establishes a statutory right to freedom in making reproductive healthcare decisions.

25

The Initiative creates a "right to reproductive freedom and privacy," which includes "the right of privacy in making personal decisions about reproductive health care in consultation with a health care provider."

We conclude that the Attorney General's short title fails to capture two key characteristics of the Initiative: the expanded right to an abortion post-viability and the limitations on healthcare provider liability. In doing so, the short title indicates that the Initiative only concerns two changes to Idaho law: a right to abortion up to fetal viability and a right to make reproductive healthcare decisions. As a result, the short title is misleading and fails to "accurately acquaint the prospective signer with what he or she is sponsoring." *See Open Primaries*, 172 Idaho at 482, 533 P.3d at 1278 (cleaned up) (quoting *Echohawk*, 124 Idaho at 151, 857 P.2d at 630).

However, we do not agree with Idahoans United that the short title fails to accurately capture the right to privacy aspect of the Initiative. The short title provides that the Initiative establishes "a right . . . to make reproductive decisions regarding one's own body." In comparison, the Initiative defines the right to reproductive freedom and privacy as "the right to make personal decisions about reproductive health care that directly impact the person's own body." The short title language is very similar to the Initiative's definition of the right to privacy. We conclude that the short title therefore accurately captures the right to privacy aspect of the Initiative.

We are not persuaded by the Attorney General's argument that the short title is substantially compliant with the distinctiveness requirement because it includes the "general topic" of the Initiative. Citing our decision in *Echohawk*, the Attorney General claims that the short title does not need to be "all-encompassing" to be distinctive. Our decision in *Echohawk* is distinguishable.

In *Echohawk*, the petitioners filed an initiative that proposed several changes to then-existing Idaho law. 124 Idaho at 151, 857 P.2d at 630. The Court identified four distinctive elements of the initiative:

> the prohibition of granting homosexuals "minority status," the prohibition of "same-sex marriages" and "domestic partnerships," restrictions against discussing homosexuality in the public schools, and restrictions against the expenditure of public funds for certain purposes relating to homosexuals.

*Id.* The Attorney General's short title stated: "An act establishing state policies regarding homosexuality." *Id.* at 149, 857 P.2d at 628. The Court found that the short title included the

26

distinctive characteristic of the initiative that "it would establish various state policies towards homosexuality." *Id.* at 151, 857 P.2d at 630.

In *Echohawk*, the Court specifically noted that the short title captured the *distinctive* characteristic of the initiative, which was to establish state policies relating to homosexuality. *Id.* This action presents a different situation. Here, because the short title only identifies two distinctive characteristics, it suggests that those are the only two changes to Idaho law proposed by the Initiative. While the Attorney General's short title in this case may identify what he believes to be the Initiative's most distinctive changes, the Initiative proposes to change Idaho law in other significant ways. Different people may find different aspects of the Initiative to be the most distinctive. For instance, the most important characteristic of the Initiative to healthcare providers may be that it limits their liability in certain circumstances. Another group may find the most distinctive feature to be the expanded right to an abortion after fetal viability to protect the health of the mother. However, the short title fails to alert a prospective signer to either of these proposed changes to Idaho law.

We acknowledge that fitting the distinctive characteristics of an initiative into twenty words is a challenging task. Idaho law, however, has long required that the short title be distinctive and comprehensive. *AFL*, 75 Idaho at 373, 271 P.2d at 710 ("[T]his short title . . . must also be distinctive."); *Echohawk*, 124 Idaho at 151, 857 P.2d at 631 ("[T[he fundamental inquiry is whether the short title is 'distinctive.' "); *Buchin*, 128 Idaho at 270, 912 P.2d at 638 ("The short title is to be comprehensive in nature."). While *Echohawk* provides one example of how this may be done for a short title with multiple distinctive elements, the Attorney General is not constrained to the method used in *Echohawk.* It may be possible to include all four characteristics into a twenty-word short ballot title. The Attorney General is free to exercise his discretion in writing the short ballot title so long as he substantially complies with the statutory requirements in a manner consistent with this opinion.

**D. The long title substantially complies with Idaho Code section 34-1809.**

The Attorney General's long ballot title states:

> The measure seeks to change Idaho's laws by introducing a right to reproductive freedom and privacy including a right to abortion up to the point of the fetus's ability to survive outside the womb. After fetal viability, there would be no general right to abortion except in cases of "medical emergency." The "medical emergency" exception would expand Idaho's current life exception and allow abortions when pregnant women face complicating physical conditions that

27

threaten their life or health, "including serious impairment to a bodily function" or "serious dysfunction of any bodily organ or part."

The proposed measure codifies a right to make reproductive decisions, including contraception, fertility treatment, and prenatal and postpartum care. This includes a "right of privacy" in making these decisions. The measure seeks to prevent the state from enforcing certain abortion laws protecting the life of the unborn child. It would also impose a requirement that any restrictions on reproductive decisions, including abortion prior to fetus viability, must be "narrowly tailored to improve or maintain the health of the person seeking reproductive health care." The measure would also prevent the state from penalizing patients, healthcare providers, or anyone who assists in exercising the proposed right.

Idahoans United argues that the long title is prejudicial because "fetus viability" is "uncommon and potentially politically charged terminology." It further argues that the long title is confusing because it uses the phrases "fetus viability" and "fetal viability" interchangeably.

Idaho Code section 34-1809 tasks the Attorney General with writing a long title "expressing in not more than two hundred (200) words the purpose of the measure." I.C. § 34-1809(2)(d)(ii). "[U]nlike the short title, the long title is not required to be distinctive or to use language by which the measure is commonly referred to or spoken of." *Open Primaries*, 172 Idaho at 487, 533 P.3d at 1283. It bears repeating that "[i]t is not the Court's role to find another way or the best way to draft a long title, but rather to examine the Attorney General's language and ask whether it expresses the 'purpose of the measure' without being argumentative or prejudicial." *Id.*

For the reasons previously discussed, we hold that the phrase "fetus viability" substantially complies with the statutory requirement that the language of the long title not prejudice the Initiative. We further hold that the use of both "fetal viability" and "fetus viability" in the long title does not create confusion. As previously noted, the terms "fetus" and "fetal" are different parts of speech describing the same concept and as a result the use of both phrases is not confusing. We hold that the long title substantially complies with Idaho Code section 34-1809.

**E. We retain jurisdiction of this matter and issue writs of mandamus ordering DFM to provide a new FIS and ordering the Attorney General to provide a new short ballot title to this Court for review.**

Having determined that the FIS and the short ballot title fail to substantially comply with Idaho law, we now turn to the appropriate remedy. Idahoans United asks this Court to certify the FIS and short ballot title drafted by Idahoans United. In the alternative, it asks us to issue writs of mandamus to DFM and the Attorney General directing them to issue an FIS and a short ballot title

28

in accordance with Idaho law. We decline to certify the FIS or the ballot titles provided by Idahoans United and instead issue writs of mandamus to DFM and the Attorney General.

As in *Open Primaries*, the most appropriate remedy in this action is to retain jurisdiction of this matter and order DFM to provide a statutorily compliant FIS and order the Attorney General to provide a statutorily compliant short ballot title. *See Open Primaries*, 172 Idaho at 490, 533 P.3d at 1286. It is not appropriate at this stage for the Court to dictate the details of either document or draft a short ballot title itself. However, given that the people's constitutional right to direct legislation reserved in Article III, section 1 of the Idaho Constitution is at issue, and the time concerns expressed by Idahoans United, we will retain jurisdiction to ensure a timely resolution of this action. *Id.*

We understand that DFM may require some time to gather the necessary information and input to calculate the fiscal impact of the Initiative's proposed changes to Idaho law. Accordingly, we will give DFM seven calendar days to prepare a new FIS. We order DFM to provide a new FIS that complies with Idaho Code section 34-1812 to this Court by 4 p.m. MDT on June 23, 2025. To avoid further litigation concerning the reasonable basis for any estimated impact that may be described in the FIS, we also order DFM to submit a sworn declaration by the preparer of the FIS describing the process utilized, including the evidence gathered and the assumptions utilized to create the FIS. We will review the FIS and supporting declaration to determine whether it substantially complies with section 34-1812. No further briefing or oral argument will be granted concerning the new FIS.

We order the Attorney General to provide a new short title to this Court. In the interest of consistency, we will also grant the Attorney General seven calendar days to prepare a new short ballot title. We order the Attorney General to provide a new short ballot title that complies with Idaho Code section 34-1809 to this Court by 4 p.m. MDT on June 23, 2025. We will review the short ballot title to determine whether it substantially complies with the statute. No further briefing or oral argument will be granted concerning the short ballot title.

## F. We decline to grant attorney fees to Idahoans United.

Idahoans United seeks attorney fees under Idaho Code section 12-117(1). Idaho Code section 12-117(1) allows the prevailing party in a proceeding between a person and a governmental entity to be awarded attorney fees if the "nonprevailing party acted without a reasonable basis in fact or law." I.C. § 12-117(1); *Open Primaries*, 172 Idaho at 491, 533 P.3d at 1287. This Court

"examines the prevailing party question from an overall view, not a claim-by-claim analysis." *Open Primaries*, 172 Idaho at 491, 533 P.3d at 1287 (quoting *Dep't of Transp. v. Grathol*, 158 Idaho 38, 53, 343 P.3d 480, 495 (2015)).

Considering the mixed results in this action, and taking an overall view of the proceedings, we decline to grant attorney fees to Idahoans United against DFM. The claims against DFM presented an issue of first impression and DFM's arguments were reasonable. We also decline to grant attorney fees to Idahoans United against the Attorney General. Both parties prevailed in part and therefore we hold there is no prevailing party for purposes of attorney fees.

## V. CONCLUSION

For the reasons discussed herein, we dismiss the Petition against the Secretary of State, partially grant the Petition for writs of mandamus against DFM and the Attorney General, and deny the Petition for writs of certiorari.

We retain jurisdiction of this matter and order DFM to provide a new FIS that complies with Idaho Code section 34-1812 to this Court by 4 p.m. MDT on June 23, 2025. At that time, DFM shall also file with this Court a sworn declaration by the preparer of the submitted FIS that explains the process utilized, evidence gathered, and assumptions used to create the new FIS. We order the Attorney General to submit a new short ballot title that complies with Idaho Code section 34-1809 to this Court by 4 p.m. MDT on June 23, 2025. No party is awarded costs or attorney fees.

Chief Justice BEVAN, and Justices BRODY, MOELLER, and MEYER CONCUR.


## ON THE SUBMISSION OF A NEW FISCAL IMPACT STATEMENT AND A NEW SHORT BALLOT TITLE

ZAHN, Justice.

DFM timely submitted a new FIS along with a sworn declaration by the preparer of the submitted FIS in accordance with this Court's June 16, 2025, opinion and order. The new FIS states:

> ***Summary of Fiscal Impact Statement***
> The State estimates the initiative would increase state expenditures between $3,100 and $7,800 annually, less than 0.001% of the state share of Idaho's Medicaid budget. This impact is derived from the costs of treating chemical abortion complications for women enrolled in Idaho's Medicaid program. Medicaid covers medically necessary services to treat complications from all abortions. It is

30

anticipated that as legal abortions increase, the complications will also increase. This will likely result in an increase in Medicaid covered services and expenditures to treat complications from chemical abortions, which the State has reliable and readily available data to support.

***Detailed Statement of Fiscal Impact Including Assumptions***

Based on the amount of reliable data gathered by the Division [sic] Financial Management (DFM) and the outcome of the initiative (if passed), DFM limited its assumptions about any increase in costs to the state to those costs arising from the treatment of Medicaid recipients for chemical abortion complications. DFM does not have reliable and readily accessible data to reasonably calculate the fiscal impact attributable to the complications for surgical abortions.

Based on data provided by Department of Health and Welfare (DHW), DFM considered the number of childbearing women on Medicaid in 2021 which was 97,055. This represents about 25% of the total Idaho population for women in this same age group. DFM assumed that, as a result of this initiative, the number of chemical abortions conducted annually would increase to the levels prior to 2022, the year of the U.S. Supreme Court's decision returning the regulation of abortion to the States. Based on the number of chemical abortions performed in Idaho using the 2021 data from the vital records report (approximately 1,180), DFM assumed 25% (approximately 300) of those individuals were Medicaid recipients.

Taking the number of Medicaid recipients who would receive a chemical abortion, DFM assumed that 2% - 5% of those chemical abortions would result in complications. DFM assumed this based on information provided in (1) the United State's [sic] Food and Drug Administration's warning label for the Mifeprex and (2) studies related to abortion complications that were published on the National Library of Medicine website, which DHW provided to DFM.

Based on the claims for complications from chemical abortions provided by DHW for 2019 and 2022 claims data, DFM applied an average per person claim cost and added a 4% medical inflation year over year to account for current medical costs in FY2026. Based on that calculation, DFM assumes that about 300 individuals on Medicaid in Idaho could receive a chemical abortion and of those, 6 to 15 individuals could have complications from that chemical abortion with an average claim cost of about $531 (state portion of the cost). Based on the process utilized, evidence readily available and gathered, and assumptions used to create the fiscal impact statement, total expenditures for the state would range from $3,100 to $7,800 per year.

While the specific fiscal impact to the state's expenditures is difficult to quantify, DFM cannot in good faith conclude that the proposed initiative will have no fiscal impact on state expenditures.

Having reviewed the new FIS and accompanying declaration, we conclude that the new FIS is consistent with the views expressed in our prior opinion dated June 16, 2025. We also conclude that the FIS substantially complies with the requirements of Idaho Code section 34-1812.

The Attorney General timely submitted a new short ballot title in accordance with this Court's June 16, 2025, opinion and order. The revised short ballot title states:

Measure creating right to abortion before fetus viability, and post-viability to protect health; right to privacy; healthcare provider liability protections.

Having reviewed the new short ballot title, we conclude that it is consistent with the views expressed in our prior opinion dated June 16, 2025, and that it also substantially complies with the requirements of Idaho Code section 34-1809. Therefore, we certify the new short ballot title to the Idaho Secretary of State as required by Idaho Code section 34-1809(3)(c).

Chief Justice BEVAN, and Justices BRODY, MOELLER, and MEYER CONCUR.